UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| GUMMY BEAR INTERNATIONAL, INC.,<br><br>Plaintiff,<br><br>v.<br><br>SOONOVA, LLC, ET AL.,<br><br>Defendants. | **Case No.: 1:25-cv-04832-JMF** |

**REPLY FROM DEFENDANTS EVERYMARKET, INC. AND IBSPOT INC. TO PLAINTIFF'S OPPOSITION TO MOTION TO DISMISS**

Defendants Everymarket, Inc. ("Everymarket"), a corporation organized under the laws of New York, with its principal place of business in Missouri, and Ibspot Inc. ("Ibspot"), a corporation organized under the laws of New York, with its principal place of business in Florida (collectively, the "Moving Defendants"), submit this Reply to the Opposition [Document No. 104] filed by Plaintiff. As regards the Moving Defendants, the Plaintiff in its Second Amended Complaints ("SAC") [Document No. 68] has failed to state a claim upon which relief can be granted, and therefore pursuant to F.R.C.P. 12(b)(6), this Court should dismiss all of the claims against them entirely, with prejudice.

**INTRODUCTION**

Defendant Everymarket was founded in Manhattan in 2014 as an ecommerce platform with the mission to bring premium quality and unique products to customers through online shopping in their own homes. Defendant Ibspot is an ecommerce retailer that was built for U.S. shoppers to explore global trends—from K-beauty and J-fashion to European wellness and international tech gadgets. Each of these Defendants is a small business with very limited resources and staff. The businesses operate under very tight margins.

It is obvious that the Plaintiff through its SAC, which names 67 parties, and its Opposition to the Defendants' Motion to Dismiss, which claims the Moving Defendants generate "hundreds of millions" of dollars in sales, is seeking deep pockets for a lottery-like courthouse payday. Unfortunately for the Plaintiff, the court system is not Powerball, and their estimate of the Plaintiff's revenue is off by several hundreds of millions. The Plaintiff will also likely be sad to find that, like that unlucky Powerball ticket that wins the buyer nothing, a grand total of *zero* (as in, $0.00) dollars were contributed to the Moving Defendants' modest revenue streams by *any* product related to the Plaintiff—unless of course, the Court counts the money generated by the purchase of one doll from each platform by the Plaintiff's *very own counsel,* Mr. Russel Bogart. Mr. Bogart's purchases, that each occurred only a few days before this case was filed, generated, respectively, $18.99 and

$49.29 in revenue, for a grand total of $68.28 in combined sales between the Moving Defendants. Despite the meager sum at issue, which would be miniscule even by small claims court standards and is entirely attributable to the Plaintiff's counsel's own online shopping spree—the Plaintiffs have chosen to file this case and troll the Moving Defendants for "treble" damages—which would come to $204.84. This is how the Plaintiff trolls would use the federal judicial system's critically important resources—on a dispute over pocket money.

**ARGUMENT**

I. **The Plaintiff Failed to State Copyright Claims Against the Defendants.**

Because it was the Plaintiff's counsel that in bad faith triggered the two sales of stuffed-bear dolls at issue, there are zero "actual" copyright damages attributable to even a single real customer purchase. The Plaintiff hinges its entire thesis on the idea that it is due a multi-million dollar jackpot under 17 U.S.C. § 504(a) that is a combination of "lost profits," "license" fees, and "pre-suit investigative costs." The problem is, nowhere in its SAC does the Plaintiff plausibly allege that any of these exist. There were zero actual sales of the dolls by either of the Moving Defendants; no reasonable person would spend a single dollar on a licensing deal that is likely to result in such a low (i.e., zero) amount of sales; and the Plaintiff never alleged any "pre-suit investigative costs" were incurred due to any activity attributable to the Moving Defendants. To the contrary, the Plaintiff's own counsel had to fabricate a controversy by buying the products at issue *himself* in hopes that it would be he and his client's winning lottery ticket. That the Plaintiff found and cited to another case where a "$10.7 million judgment" was awarded based on "licensing value" has no correlation here, where the licensing value of a product that generates zero sales is still zero. Similarly, the Plaintiff cited in his Opposition to a case where "$106,297" was awarded for "pre-suit investigative costs," but at no time even alleged that a single dollar in pre-suit investigative costs was expended by the Plaintiff in the present case. Just because someone, somewhere

was once entitled to a court payday does not mean the Plaintiff is entitled to one, here.

The Plaintiff's efforts to prop up its damages argument by stating that the recovery of "statutory" damages could be possible under section 504(c)(1), or even that the recovery of "willful" infringement damages could be possible under section 504(c)(2), similarly fails due to its lack of any connection to reality.  By the Plaintiff's own arguments, the factors used to set statutory damages include the "infringer's state of mind"; the "*profits earned*" by the infringer; the "*revenue lost*" by the copyright holder; and the "infringer's cooperation in providing evidence concerning the value of the infringing material."  Contrary to the Plaintiff's pie-in-the-sky theory, the Moving Defendants are not sophisticated ecommerce sellers.  Each of the Moving Defendants is a small business that incidentally uploaded a plush bear product to an ecommerce website without knowing there was any connection to the Plaintiff whatsoever.  The Moving Defendants had no negative state of mind when they placed the dolls on their respective sites, and the Plaintiff could have simply contacted the Moving Defendants with a takedown letter to request removal of the products from the two platforms.  Instead, the accidental uploads, which resulted in a grand total of *zero* actual sales, were not identified by the Moving Defendants until the present lawsuit was filed.  The "profits earned" by the Moving Defendants were at best nominal, in the $10 to $20 range, total.  The "revenue lost" by the copyright holder was zero—since the sales at issue would never have occurred if the Plaintiff's counsel had not attempted to fabricate this controversy through the purchase of two dolls (which themselves would retail for $12.99 each for a maximum sum in "lost" revenue of $25.98).

Despite that the Moving Defendants fully cooperated with the Plaintiff to share "evidence concerning the value of the infringing material" by opening their sales records and demonstrating that there were zero actual sales of the "infringing" plush bear products, the Plaintiff has continued to double down on a hand it should have folded long ago.  The

innocent Moving Defendants—each one a *platform* for ecommerce sales—are so small and unsophisticated that they accidentally uploaded these plush bear items without even knowing it. The Plaintiff has not concretely alleged a single vocational step either of the Moving Defendants took to infringe.

In its Opposition, the Plaintiff went all in on its false and baseless argument that the Defendants committed "willful" infringement solely because these ""extremely sophisticated" sellers supposedly generated "hundreds of millions of dollars" in ecommerce sales and are therefore "well-heeled" enough to set up "clearance procedures" for intellectual property rights. These arguments are all as false as they are entirely counterfactual. The Moving Defendants are not sophisticated; they are small, private ecommerce businesses that do not generate revenue even remotely close to "hundreds of millions of dollars," that never even sold a single one of the Plaintiff's plush bears, and that cannot afford to set up "clearance procedures" that would satisfy every copyright troll without tanking their fledgling businesses. The totality of these factors together with Rule 1's call that the rules for federal civil actions be "construed, administered, and employed by the court and the parties to secure the just, speedy, and inexpensive determination of every action" weigh heavily in favor of dismissal of all copyright claims against the Moving Defendants, lest the Court undergo a costly and wasteful judicial exercise over a fabricated controversy that could have easily been avoided with a simple email. A controversy that resulted in no actual harm to anyone.

## II. The Plaintiff Failed to State Trademark Counterfeit Claims Against the Defendants.

Section 45 of the Lanham Act defines a "counterfeit" as "a spurious mark which is identical with, or substantially indistinguishable from, a registered mark." 15 U.S.C. § 1127. "Although 'spurious' is not a statutorily defined term under the Lanham Act,... courts in this Circuit have [defined it as] '[d]eceptively suggesting an erroneous origin; fake.'" *Excelled*

*Sheepskin & Leather Coat Corp. v. Oregon Brewing Co.*, No. 12 CIV. 1416 GBD RLE, 2015 U.S. Dist. LEXIS 96337, 2015 WL 4468083, at *3 (S.D.N.Y. July 8, 2015); *see also Fujifilm N. Am. Corp. v. Plr IP Holdings, LLC,* 2019 U.S. Dist. LEXIS 6497, *6-7.

The Second Circuit has stated that an allegedly counterfeit mark must be compared with the registered mark as it appears on actual merchandise to an average purchaser. *See Montres Rolex, S.A. v. Snyder*, 718 F.2d 524, 533 (2d Cir. 1983) (interpreting the federal customs law that prohibits importation of counterfeit merchandise and tracks the "substantially indistinguishable" definition of counterfeit in 15 U.S.C. § 1117); *see also Colgate-Palmolive Co. v. J.M.D. All-Star Imp. & Exp.*, 486 F. Supp. 2d 286, 292 ("[i]n general,... marks that are similar to the registered mark, but differ by two or more letters, are not likely to be considered counterfeit). In *Montres Rolex,* for example, the court analyzed that "it could not be seriously contended that the average consumer would have found" the mark for "Amazonas" on shoe heels and soles substantially indistinguishable from "Amazon"; it also found that the average purchaser would likely not consider a "Bolivia" watch to be substantially indistinguishable from a "Bulova" watch). *Montres Rolex,* 718 F.2d 524 at 531-32.

In *Fujifilm N. Am. Corp. v. Plr IP Holdings, LLC*, 2019 U.S. Dist. LEXIS 6497, the court discussed that "[c]ounterfeiting, -- 'the hard core or first degree of' intellectual property offenses, *Gucci Am., Inc. v. Guess, Inc.*, 868 F. Supp. 2d 207, 242 (S.D.N.Y. 2012) (internal quotation marks omitted) -- thus differs from mere trademark infringement in three critical respects." *Fujifilm N. Am. Corp. v. Plr IP Holdings, LLC*, 2019 U.S. Dist. LEXIS 6497, *7. "First, the alleged counterfeit must copy a registered mark; second, the copying must be so direct that the alleged counterfeit appears identical to (or else substantially indistinguishable from) the registered mark; and third, beyond copying the registered mark to the point of indistinction, the counterfeit must be used to 'pass[] off' the infringer's product as the original, rather than merely presented in a manner likely to confuse some consumers as to the

origin or sponsorship of the infringer's product. *Id.*, citing *Audemars Piquet Holding S.A. v. Swiss Watch Int'l, Inc.*, No. 12 CIV. 5423 LAP, 2015 U.S. Dist. LEXIS 3207, 2015 WL 150756, at *2 (S.D.N.Y. Jan. 12, 2015).

Here, Plaintiff alleges that each of the Moving Defendants committed trademark counterfeiting against its Gummibär Mark (U.S Trademark Registration Number 4335076) ("Gummibär Mark"). But there is no indication in the SAC that the Moving Defendants included the "Gummibär Mark" on the package of the Moving Defendants' products or their website pages. In fact, the product allegedly offered for sale by Everymarket was a Verceco branded doll ("Verceco Doll"). On Everymarket's webpage listing the product, Everymarket used the trademark "Verceco" explicitly in its product title and description. A normal consumer would reasonably distinguish the brand Verceco from the Plaintiff's Gummibär Mark as they consist of totally different letters. Likewise, the products allegedly offered by Ibspot included, (1) a "TUMPETY" branded doll titled, "Tumpety Gummy Bear Plush Green Singing Bear Toy Christmas Celebration Props Accompanying Toys Before Going to Bed" ("Tumpety Listing," or "TUMPETY Doll"); (2) a doll listed as an "Unbranded Singing I Am A Gummy Bear Musical Soft Plush Doll Toys Kids X-Mas Gift" ("Gummy Bear Listing"); and, (3) a doll listed as a "Xefuu 12 Inch Gummy Bear Plush Toy Singing Bear Song Toy Stuffed Animal Doll for Kids Birthday Gift Christmas Party Supplies" ("Xefuu Listing"). Ibspot used the trademark "TUMPETY" or "Xefuu" explicitly in the product title and description of its webpages about these products. A normal consumer would reasonably distinguish the brand TUMPETY from the Plaintiff's Gummibär Mark as they consist of totally different letters.

In addition, as each of the Moving Defendants stated in their respective Motion to Dismiss principal briefs, the Plaintiff previously sought registration of a "Gummy Bear" mark (depicting a bear design) in Class 28 (toys) with the U.S. Serial No. 77548079. But the Plaintiff failed to secure the mark after the Plaintiff did not respond to an office action initiated by the United States Patent and Trademark Office ("Office Action"). This trademark

7

was ultimately abandoned by the Plaintiff, and thus the Plaintiff holds no enforceable rights to the term "Gummy Bear" or "Gummy Bears" and cannot assert trademark protection over either term. Ibspot's descriptive use of a "Gummy Bear" doll does not infringe upon Plaintiff's Gummibär Mark.

Applying the trademark counterfeiting factors for review that were established in *Fujifilm N. Am. Corp. v. Plr IP Holdings, LLC*, none of the three criteria outlined by that court are met here. Neither of the Moving Defendants has copied any of the Plaintiff's registered trademarks. The Plaintiff has offered no arguments or evidence to indicate that Everymarket copied the Gummibär Mark on the package of its Verceco Doll products or its website pages. The Plaintiff has also conceded that Ibspot were explicitly listed as non-Gummibär Mark products. Therefore, the Plaintiff has failed to establish any trademark counterfeit claim against either of the Moving Defendants.

Finally, with regards to the Verceco Doll and Plaintiff's Gummibär Mark, the counterfeit claim should be dismissed because a direct comparison of Verceco Doll and the Gummibär Mark indicates several key differences.



| Verceco Doll | Gummibär Mark |
|---|---|

Based on the drawings, the Verceco Doll and the character of Plaintiff's Gummibär Mark have five key differences: (1) the Verceco Doll's facial design features a wider face

with pink blush on its cheeks; (2) the funny crossed eyes of the Gummibär character is one of the most memorable parts of Plaintiff's design, whereas the Verceco Doll does not have crossed eyes; (3) the Verceco Doll has a closed smiling mouth, in contrast to the wide-open mouth of the Gummibär character; (4) the Verceco Doll's body mixes two shades of green (a dark green and matte grass green), while the Gummibär character includes only one shade of bright green; and (5) the Verceco Doll does not feature the yellow-and-white underwear worn by the Gummibär character.  These differences contradict the Plaintiff's assertion that there is a substantial similarity between these two characters.  In fact, these differences completely undermine the Plaintiff's assertion that the Gummibär Mark, which the Plaintiff argues is so unique and distinctive because of its very color, ears, smile, underwear, and more, was counterfeited through the listing of the Verceco Doll, which does not feature these characteristics.  Because substantial similarity is an essential element for proving trademark counterfeit infringement, the Plaintiff cannot establish that Everymarket committed trademark counterfeiting against the Plaintiff.

**III.   The Plaintiff Failed to State Trademark Infringement, Unfair Competition, and Trade Dress Infringement Claims Against the Defendants.**

Under the Lanham Act, a plaintiff alleging trademark infringement must demonstrate that (1) "it has a valid mark that is entitled to protection" and that (2) the defendant's "actions are likely to cause confusion with [that] mark." *The Sports Auth., Inc. v. Prime Hospitality Corp.*, 89 F.3d 955, 960 (2d Cir. 1996). To prevail in a trademark infringement action, a plaintiff must prove "a probability of confusion . . . affecting numerous ordinary prudent purchasers." *Star Indus., Inc. v. Bacardi & Co. Ltd.*, 412 F.3d 373, 383 (2d Cir. 2005).

In general, to determine whether there is a likelihood of confusion, the Second Circuit Court applies the eight-factor *Polaroid* balancing test introduced by Judge Friendly in *Polaroid Corp. v. Polarad Electronics Corp.*, 287 F.2d 492 (2d Cir. 1961).  The Second

Circuit Court's analysis focuses on "the ultimate question of whether," looking at the products in their totality, "consumers are likely to be confused." See *Nora Beverages, Inc. v. Perrier Group of Am., Inc.*, 269 F.3d 114, 119 (2d Cir. 2001). "The eight factors are: (1) strength of the trademark; (2) similarity of the marks; (3) proximity of the products and their competitiveness with one another; (4) evidence that the senior user may 'bridge the gap' by developing a product for sale in the market of the alleged infringer's product; (5) evidence of actual consumer confusion; (6) evidence that the imitative mark was adopted in bad faith; (7) respective quality of the products; and (8) sophistication of consumers in the relevant market." *Star Indus. v. Bacardi & Co.,* 412 F.3d 373, 384.

In *Polaroid Corp. v. Polarad Electronics Corp.,* the court held that although the "plaintiff's mark [was] a strong one and the similarity between the two names [at issue was] great, but the evidence of actual confusion, when analyzed, [was] not impressive." *Polaroid Corp. v. Polarad Elecs. Corp.*, 287 F.2d 492, 495. The court reasoned that "[t]he [product at issue] seemed to be the only case where [the] defendant [had] sold, but not manufactured, a product serving a function similar to any of plaintiff's, and plaintiff's sales of this item [were] highly irregular, varying, e.g., from $ 2,300 in 1953 to $ 303,000 in 1955, and $ 48,000 in 1956." *Id*.

Here, Plaintiff alleges that each Moving Defendant infringed its Gummibär Mark. However, as stated in above, Everymarket explicitly used and displayed the Verceco trademark on its Verceco Doll product packaging and webpage. Verceco is totally distinguishable from the Plaintiff's Gummibär Mark. Everymarket's action would not cause confusion to a normal customer as to the origin or sponsorship of the product. Secondly, the Plaintiff is a content production company focusing on the character of its Gummibär animation. Everymarket is a small but comprehensive ecommerce platform like Amazon or eBay that sells a wide variety of products including cosmetics, health products, electronics, home and garden products, etc. The business scopes of the Plaintiff and Everymarket are substantially different. The Verceco Doll listed by Everymarket was supplied by a third party

10

manufacturer. Everymarket neither manufactured such products nor stocked any inventory. This Verceco Doll generated only one order, the order made by Plaintiff's counsel. Similar to *Polaroid Corp. v. Polarad Electronics Corp.,* the evidence of any actual confusion is not impressive as Everymarket explicitly used the Verceco trademark on its product webpage.

The situation with Ibspot and its listings of the TUMPETY Doll and Xefuu Doll are similar. Ibspot explicitly displayed the TUMPETY and Xefuu trademark on its product listing webpages. Ibspot's action would not have caused confusion to a normal customer as to the origin or sponsorship of the alleged products. In addition, Ibspot is also a comprehensive ecommerce platform like Amazon or eBay and it sells a wide variety of products including cosmetics, health products, electronics, home and garden products, etc. Its business scope is substantially different from the Plaintiff's. The product TUMPETY Doll listed by Ibspot was supplied by a third party manufacturer. Ibspot neither manufactured such products nor stocked any inventory. This TUMPETY Doll generated only one order that was made by the Plaintiff's counsel. The other two product listings Plaintiff discussed had zero sales.

For the reasons set forth above, Plaintiff has failed to prove either of the Moving Defendants committed trademark infringement against the Plaintiff's Gummibär Mark.

## CONCLUSION

For the foregoing reasons, Plaintiff has failed to state a claim upon which relief can be granted. Accordingly, Defendant respectfully requests that the Court dismiss the Complaint with prejudice and grant such other relief as it deems just and proper.


Dated: New York, New York                  */s/ Yen-Yi Anderson*
      December 29, 2025                   Yen-Yi Anderson
                                                              Anderson & Associates Law, P.C
                                                              347 W 36th Street, Suite 1003
                                                              New York, NY 10018
                                                              646-452-9982
                                                              y.anderson@aalawpc.com
                                                              *Counsel for Moving Defendants*